

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NEM:MND

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 24, 2024

By Email

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Can Xu, Huayi Zhong, Zebin Liu, Isaac Huynh, Chunbing Qin, 24-MJ-550

Dear Judge Levy:

The Government respectfully submits this letter in support of its motion to detain the defendants Can Xu, Huayi Zhong, Zebin Liu, Isaac Huynh and Chunbing Qin pending their removal to the U.S. District Court for District of Maryland. The defendants are Chinese citizens who were arrested today, pursuant to arrest warrants from the District of Maryland which charge them with violating Title 21, United States Code Section 846 (Conspiracy to Distribute Controlled Substances) and/or Title 18, United States Code Section 1956(h) (Conspiracy to Commit Money Laundering).[1]

The defendant will make their first appearances today before Your Honor. For the four defendants charged with the narcotics conspiracy, the nature of these charges gives rise to a statutory presumption that no condition or combination of conditions will reasonably assure the defendants' appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3)(A). As foreign nationals facing serious charges, all the defendants present significant risks of flight. For this reason and those described below, no condition or combination of conditions are sufficient to overcome the statutory presumption and the defendants should remain in custody for their removal to the District of Maryland.

[1] The defendant Isaac Huynh has only been charged with conspiracy to commit money laundering, while the remaining four defendants have been charged with both counts.

## I. Background

The government proffers the following facts concerning the charges at issue and pretrial detention.[2] See United States v. LaFontaine, 210 F. 3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same).

### A. Summary of Investigation

A 2023 investigation of two separate non-fatal shootings in Baltimore, Maryland, has revealed a sprawling network of individuals laundering millions of dollars generated from the illegal distribution of massive quantities of marijuana. That network includes large-scale launderers and drug traffickers operating in Maryland and sending large quantities of bulk cash proceeds from Maryland to other states, including New York, New Jersey, and Washington state to obtain further shipments of marijuana and to conceal the source of the proceeds. Further up within the network, individuals (based primarily in New York) collect millions of dollars in proceeds from Maryland and other states that they then transport (via various means) to other launderers and drug traffickers in Washington state and elsewhere to obtain larger shipments of marijuana and ensure that the source of the cash is concealed.

### B. Investigation into the MICKLOS DTO

In February 2023, Detectives with the Baltimore Police Department (BPD) contacted the Drug Enforcement Administration (DEA) and advised they were investigating the non-fatal shooting of an individual identified as Michael MICKLOS Jr. Detectives explained that MICKLOS had recently been involved in what they believed was a drug deal gone bad where MICKLOS was shot at but not injured. During that investigation, detectives recovered over five pounds of marijuana and over $100,000 in bulk U.S. currency from MICKLOS' rental vehicle. Approximately a week later, in a separate incident, BPD investigated another separate shooting incident involving MICKLOS, and, again, bulk U.S. currency and distribution quantities of marijuana were seized.

In December 2023, in follow up to this initial investigation, a DEA Special Agent utilized an undercover Instagram account to monitor Instagram accounts of suspected drug dealers and money launderers, including MICKLOS. That agent identified a public Instagram account—labelled "1Buckets" –which the evidence revealed was used by MICKLOS.

On this Instagram page, the agent viewed photographs of MICKLOS posing with large amounts of cash. In some of those same photographs, thousands of dollars in bulk U.S. currency and pound quantities of marijuana can be seen. The agent also viewed videos posted by MICKLOS that showed large amounts of suspected drug proceeds, with his personal diamond necklace laid across the money.

---

[2] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

Furthermore, MICKLOS's Instagram account promoted a "Telegram" page where MICKLOS marketed pound quantities of marijuana for sale. MICKLOS listed different strains of marijuana he had available as well as prices from as low as $600 to upwards of $1,500, per pound. MICKLOS claimed to have the lowest prices on the East Coast and the ability to ship marijuana worldwide.

Further investigation revealed that MICKLOS was a leader of a well-structured nationwide Drug Trafficking Organization (DTO) that generates significant amounts of drug proceeds (the "MICKLOS DTO").

Since the inception of the investigation, agents have utilized numerous techniques, including undercover purchases, surveillance, search warrants, GPS tracking and other investigative techniques, to further uncover the drug proceeds of the MICKLOS DTO. These investigative steps ultimately led to Title III authorization to intercept MICKLOS's communications.

On March 1, 2024, and continuing until the present date, the Honorable Julie R. Rubin, United States District Judge for the District of Maryland, authorized the interception of electronic communications occurring over twelve telephone lines associated with the MICKLOS DTO, including the following individuals appearing before the Court today: Can XU and Huayi ZHONG.

Over the course of these interceptions, investigators identified DTO members operating under MICKLOS's direction in various cities throughout the United States. Investigators were further able to identify sources of supply responsible for supplying the MICKLOS DTO with thousands of pounds of marijuana. To date throughout this investigation, investigators have conducted enforcement operations leading to the seizure of approximately 300 pounds of marijuana, firearms, over $3 million in bulk U.S. currency, and other evidence of drug trafficking and money laundering.

C. Summary of Each Defendant's Role in the Alleged Conspiracy

**CAN QUAN XU (Compl. ¶¶ 186-233):** XU, also known as "Shawn," has been identified as a multi-million-dollar marijuana distributor operating a DTO in New York, as well as the leader of a well-structured money laundering organization ("MLO") in which he employs several confederates to conceal the nature, source, location, ownership, or control of the drug proceeds. XU and his associates work with marijuana sources of supply to obtain bulk quantities of marijuana and then repackage, rebrand, and distribute the marijuana to customers for distribution on the east coast. XU then collects millions of dollars in drug trafficking proceeds from his customers, which he then turns back over to his suppliers and/or sends to bank accounts located in the People's Republic of China (PRC) using wire transfers. XU also uses the money earned through his drug trafficking for both personal use and to promote the activities of the DTO, including paying rent at locations used as stash houses, paying members of his DTO, purchasing properties, and purchasing vehicles.

**HUAYI ZHONG (Compl. ¶¶ 186-233)**: Zhong, also known as "Daniel," is a member of the XU MLO/DTO responsible for receiving marijuana shipments, packaging

marijuana, distributing marijuana to customers, and picking up/transporting drug trafficking proceeds in the form of bulk U.S. currency.

**ZEBIN LIU (Compl. ¶¶ 186-233)**: Liu, also known as "Ben," is a member of the XU MLO/DTO, with the same responsibilities as ZHONG, including receiving marijuana shipments, packaging marijuana, distributing marijuana to customers, and picking up/transporting drug trafficking proceeds in the form of bulk U.S. currency.

**CHUNBING QIN (Compl. ¶¶ 186-233)**: Qin, also known as "President Qin," has been identified as a Portland, Oregon, based marijuana supplier for the XU MLO/DTO, as well as a close associate of XU's. QIN often orchestrates shipments of marijuana to New York and helps direct the transfer of drug trafficking proceeds in the form of bulk U.S. currency from the XU MLO/DTO back to QIN and his associates in Oregon.

**ISAAC HUYNH (Compl. ¶¶ 186-233)**: Huynh, also known as "Brother Hua," has been identified as a member of the XU MLO/DTO. HUYNH is responsible for obtaining bulk amounts of drug trafficking proceeds and shipping them, via FedEx, to XU's suppliers. Investigators have seized numerous packages shipped by HUYNH during the course of this investigation, and those packages collectively contained over $650,000 in U.S. currency.

## II. Legal Standard

The defendants are charged by complaint with conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, which carries a statutory maximum term of imprisonment of a life sentence due to the weight of the controlled substances involved in the conspiracy, and conspiracy to engage in money laundering, in violation of Title 18, United States Code, Section 1956(h), which carries a twenty-year statutory maximum term of imprisonment.

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). The Bail Reform directs that four factors be considered in the detention analysis: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the person's family ties, financial resources, and length of residence in the community; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

The Bail Reform Act also "provides that there is a rebuttable presumption that 'no condition or combination of conditions will reasonably assure'" against flight or danger where probable cause supports a finding that the person seeking bail committed certain types of offenses, including—as applicable here—"an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)." See United

States v. English, 629 F.3d 311, 319 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(3)(A)). The application of the presumption means that the Court must initially assume that there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. A defendant must then come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if a defendant were to meet that burden, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

## III. The Defendants Should be Detained Pending Transport to the Requesting District

The defendants can present no evidence to rebut the presumption of detention in this case. Each of them poses a severe risk of nonappearance, particularly, as described below, they face a significant sentence and the weight of the evidence against them is strong. In addition, these defendants have a significant incentive to flee as they maintain citizenship with the PRC and therefore could not be returned to the United States to face prosecution in the event of flight.[3]

### A. The Nature and Circumstances of the Offense

The defendants are members of a sophisticated Drug and Money Laundering organization that has assisted in laundering millions of dollars in bulk U.S. currency and transporting thousands of suspected pounds of marijuana. To effectuate the scheme, these individuals routinely have engaged in activities designed to mask their behavior and evade detection, such as by shipping $650,000 in bulk U.S. currency using FedEx (see Compl. ¶¶ 216) and utilizing storage units to temporarily house significant amounts of drug proceeds (see Compl. ¶¶ 192-195). Due to the duration and scope of the operation, in addition to the amount of currency seizures that have already been made, the evidence indicates that defendants are not engaged in small, isolated narcotic sales, but rather are operating a highly orchestrated scheme with many players that was designed from inception to launder millions of dollars and transport hundreds of pounds of marijuana at a time.

The seriousness of the alleged crimes is evident in the substantial penalties that the defendants face in this case, including lengthy terms of imprisonment. The defendants' anticipated sentencing exposure under the United States Sentencing Guidelines (the "Guidelines") similarly demonstrates the seriousness of the offenses. The government estimates that even those defendants with no attributable criminal history will face base levels under the Guidelines of 32 (121-151 months' imprisonment) for the drug conspiracy and 34 (151-188 months' imprisonment) for the money laundering conspiracy.

---

[3] No extradition treaty is currently in force between the United States and the PRC. The investigating agents have not been made aware of any instances where any of these defendants – regardless of their immigration status—have either renounced or otherwise abdicated their citizenship and/or associated documents with the PRC.

B. The Weight of the Evidence is Overwhelming

The government is prepared to present at trial overwhelming evidence of the defendants' guilt. The government anticipates numerous witnesses will testify about the intricacies of the defendants' roles in the overall Drug and Money Laundering conspiracies, and that this testimony will be corroborated by, among other things, hours of intercepted communications involving each of the defendants, as well as video and audio surveillance, financial records, and evidence seized from co-conspirators. Within the next few weeks, the defendants will receive the bulk of the discovery, and the weight of that evidence, coupled with the significant sentence they face, may further encourage them to flee. In addition, law enforcement recovered additional evidence this morning, estimating that (i) several hundreds of thousands of dollars in U.S. currency and (ii) several hundred pounds of marijuana were recovered collectively between the locations where the defendants were arrested this morning.

C. The Defendants Pose a Significant Flight Risk

As members of a sophisticated money laundering and drug trafficking scheme that operates with impunity across the United States, specifically the eastern seaboard, the defendants have the opportunity, financial resources, and ability to flee in advance of trial and to potentially relocate overseas beyond the jurisdiction of the United States and its extradition powers. Furthermore, given the penalties they face and their ties to China, they have every incentive to flee See United States v. Liebowitz, 669 F. A'ppx 603, 605 (2d Cir. 2016) ("the lengthy jail sentence that could be imposed for the charged crimes provides an incentive to flee [and] the likelihood of flight is reinforced in this case by that fact that Liebowitz holds Australian as well as United States citizenship and has family members in Australia"); United States v. Baig, 536 F. App'x 91, 93 (2d Cir. 2013) (affirming detention order in part because the defendant "though a permanent resident of the United States, is a citizen of Pakistan and maintains ties there"); United States v. Mercedes, 254 F.3d 433, 438 (2d Cir. 2001) (ordering pretrial detention and reversing the district court's grant of release where the defendant was a legal permanent resident of the United States (not a citizen), faced a substantial sentence, and evidence linked him to a violent robbery); United States v. El-Hage, 213 F.3d 74, 80 (2d Cir. 2000) (noting that a defendant's "history of travel and residence in other countries" is a factor that has been long-approved by the Second Circuit in determining whether a defendant should be detained).

IV. Conclusion

Given the defendants significant incentive to flee, their nationality and ability to travel outside the territorial reach of the United States, the weight of the evidence against them, and the fact that there is a rebuttable presumption against release as to all these defendants, there government asserts that there is no combination of conditions that would ensure that the defendants reappear before the Court for which the defendants presence is sought, that being the District of

Maryland. For the reasons set forth above, the Court should deny the defendant bail pending their removal to the District of Maryland.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Molly N. Delaney
Molly Delaney
Assistant United States Attorney
Eastern District of New York
(718) 254-6571

cc: Kevin Tung, Esq. (by email)
Melony Bedford, Pretrial Services (by email)
Alex Kalim, AUSA, District of Maryland